******************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

ALEXANDER, J., with whom ROBINSON, C. J., joins, dissenting. It is well established that, when an arbitration award reinstating an employee is challenged as violative of public policy,[1] the court must determine "whether the remedy fashioned by the arbitrator is sufficient to vindicate the public policies at issue." *Burr Road Operating Co. II, LLC* v. *New England Health Care Employees Union, District 1199*, 316 Conn. 618, 639, 114 A.3d 144 (2015) (*Burr Road*); see id., 640 ("[w]e [must] consider whether the penalty imposed by the arbitrator is severe enough to deter future infractions by the grievant or others"). If it is, the award must stand. I disagree with the majority that the award in the present case—reinstatement of the grievant without so much as a letter of reprimand or warning in his personnel file—satisfies this standard.

I am aware of only one Connecticut case involving a colorable public policy challenge to an arbitral award in which the arbitrator imposed no sanction whatsoever. In that case, this court affirmed the trial court's judgment vacating the award as against public policy. See *Groton* v. *United Steelworkers of America*, 254 Conn. 35, 36–37, 52, 757 A.2d 501 (2000).[2] The case

---

[1] The majority assumes, for purposes of this appeal, that "the arbitration award reinstating the grievant implicates the explicit, well-defined and dominant public policies of protecting victims of domestic violence, including authorizing protective orders; see General Statutes (Supp. 2018) § 46b-15; protecting children; see, e.g., General Statutes (Supp. 2018) § 17a-101 (a); and preventing interference with or endangering the police. See, e.g., General Statutes (Rev. to 2017) § 53a-167a (a)." (Footnote omitted.) I agree that these policies are implicated in this case, in addition to the public policy against armed resistance to arrest and breach of the peace.

[2] Discipline was imposed in all such cases cited in the majority opinion except *Groton*. See *New Haven* v. *AFSCME, Council 4, Local 3144*, 338 Conn. 154, 167, 182 and n.19, 257 A.3d 947 (2021) (loss of two years of pay and benefits); *State* v. *Connecticut Employees Union Independent*, 322 Conn. 713, 720, 142 A.3d 1122 (2016) (six month suspension without pay); *Burr Road Operating Co. II, LLC* v. *New England Health Care Employees Union, District 1199*, supra, 316 Conn. 627 (one month suspension without pay and final warning); *State* v. *AFSCME, Council 4, Local 391*, 309 Conn. 519, 523, 69 A.3d 927 (2013) (one year suspension without pay and benefits),

law reveals that, in most cases involving public policy challenges to arbitral awards, it is precisely *because* discipline was imposed that courts are able to conclude that an award does *not* violate public policy. See, e.g., *Eastern Associated Coal Corp.* v. *United Mine Workers of America, District 17*, 531 U.S. 57, 65–66, 121 S. Ct. 462, 148 L. Ed. 2d 354 (2000) ("The award before us is not contrary to [public policy because it] . . . does not condone [the grievant's] conduct or ignore the risk to public safety that drug use by truck drivers may pose. Rather, the award punishes [the grievant] by suspending him for three months, thereby depriving him of nearly [$9000] in lost wages . . . it requires him to pay the arbitration costs of both sides; it insists [on] further [substance abuse] treatment and testing; and it makes clear (by requiring [the grievant] to provide a signed letter of resignation) that one more failed test means discharge." (Citation omitted.)); *Way Bakery* v. *Truck Drivers Local No. 164*, 363 F.3d 590, 596 (6th Cir. 2004) ("[T]he arbitration award . . . did not condone [the employee's off-duty, racially offensive remark to a coworker], but rather punished him by depriving him of his salary for six months and placing him on probation for five years. . . . We therefore hold that the arbitrator's award . . . did not violate public policy."); *New Haven* v. *AFSCME, Council 4, Local 3144*, 338 Conn. 154, 182, 257 A.3d 947 (2021) ("an award reinstating [the employee] but . . . essentially docking her two years of pay . . . [was sufficient to] vindicate the public policies at issue and [to] send a powerful message to other municipal employees and the public at

*State* v. *New England Health Care Employees Union, District 1199, AFL-CIO*, 271 Conn. 127, 132, 855 A.2d 964 (2004) (thirty day suspension without pay and benefits), *State* v. *AFSCME, Council 4, Local 387, AFL-CIO*, 252 Conn. 467, 471, 747 A.2d 480 (2000) (sixty day suspension without pay); *South Windsor* v. *South Windsor Police Union, Local 1480, Council 15, AFSCME, AFL-CIO*, 41 Conn. App. 649, 651, 677 A.2d 464 (150 day suspension without pay), cert. denied, 239 Conn. 926, 683 A.2d 22 (1996).

large that similar conduct will not be tolerated" (footnote omitted)); *State* v. *Connecticut Employees Union Independent*, 322 Conn. 713, 738, 142 A.3d 1122 (2016) ("[T]he discipline the arbitrator imposed was appropriately severe, and sends a message to others who might consider committing similar misconduct that painful consequences will result. The award provides a disincentive for the grievant to reoffend, and it makes clear that, should he be foolish enough to do so, he will be seeking new employment."); *Stratford* v. *AFSCME, Council 15, Local 407*, 315 Conn. 49, 61 n.6, 105 A.3d 148 (2014) (concluding that "the sanction of nine months without pay and future medical examinations is a sufficiently severe penalty that [reinstatement] does not violate public policy"); *Aurora* v. *Assn. of Professional Police Officers*, 124 N.E.3d 558, 575 (Ill. App.) (upholding award reinstating employee because "remedy [was] severe enough that [the employee] and the community knew that [the employee's] behavior was not acceptable"), appeal denied, 124 N.E.3d 505 (Ill. 2019); *De Witt* v. *AFSCME, Council 31*, 298 Ill. App. 3d 634, 639, 699 N.E.2d 163 (The arbitrator's award reinstating the employee "without the slightest reprimand for her behavior" violated public policy because the arbitrator "did not take any precautionary steps to deter future misconduct or to ensure it will not be repeated. . . . If anything, the arbitrator's award encourages [future] misconduct . . . [by] employees . . . ." (Citation omitted.)), appeal denied, 181 Ill. 2d 569, 706 N.E.2d 496 (1998); *Philadelphia Housing Authority* v. *AFSCME, District Council 33, Local 934*, 617 Pa. 69, 79, 52 A.3d 1117 (2012) ("the arbitrator's award forcing [the employer] to take [the employee] back with full back pay—without any sanction at all—violates a well-defined and dominant public policy against sexual harassment in the workplace"); cf. *International Union of Operating Engineers, AFL-CIO, Local 286* v. *Port*

*of Seattle*, 176 Wn. 2d 712, 723, 295 P.3d 736 (2013) ("when an arbitrator's punishment is so lenient that it will not deter future discrimination—including discrimination committed by others—it must be vacated"). Indeed, the arbitration award in the present case is unprecedented in this state and in virtually every other jurisdiction by virtue of its failure to impose any sanction for conduct demonstrably at odds with the public policies at issue, the employee's job duties, and the employer's mission, regulations, and goals.[3]

---

[3] The majority responds to this point, and the ample case law supporting it, by arguing that the courts' focus in these other cases—i.e., on whether the award was sufficient to vindicate the public policy at issue—were mere dicta rather than being essential to the courts' holdings. Specifically, the majority asserts that, "[a]lthough . . . this court included . . . language in *Burr Road* [that an award must be sufficient to vindicate the public policy at issue], we disagree that it was meant to expand the scope of the public policy exception . . . ." The majority contends that "the appropriate question in [cases such as the present one] is whether nothing less than the termination of [the grievant's] employment will suffice given the public policy at issue." (Internal quotation marks omitted.) Contrary to the majority's assertion, the case law demonstrates that consideration of whether an award is sufficient to vindicate public policy is not an expansion of the public policy exception but, rather, is an essential component of it. This is why, in *Eastern Associated Coal Corp.* v. *United Mine Workers of America, District 17*, supra, 531 U.S. 65–66, the United States Supreme Court took pains to note that the award fashioned by the arbitrator in that case "was carefully crafted to address, not ignore, the public policy concerns inherent in the reinstatement of a . . . truck driver who had twice violated [federal] restrictions on marijuana use by persons in 'safety-sensitive' jobs. Reinstatement was conditioned [on] acceptance of a [three month] suspension without pay, signing of a 'last chance' agreement (an undated letter of resignation), provisions for drug treatment, random drug testing at the employer's discretion, and reimbursement of the employer's costs in arbitration. The . . . [c]ourt expressly relied on these conditions in . . . [holding that the award was not violative of public policy]." (Footnote omitted.) H. Drummonds, "The Public Policy Exception to Arbitration Award Enforcement: A Path Through the Bramble Bush," 49 Willamette L. Rev. 105, 127 (2012).

In contrast, I have traced the "nothing less than termination" language that the majority argues is the "appropriate" standard to a 2007 Appellate Court case, *Brantley* v. *New Haven*, 100 Conn. App. 853, 920 A.2d 331 (2007), in which the court stated, at the conclusion of its analysis, that it could not conclude that the plaintiff employee's conduct was "so egregious that it requires nothing less than termination of [his] employment so as not to

The critical facts are not in dispute. Following a confrontation with his wife, C,[4] the grievant engaged in a two and one-half hour armed standoff with the police. The trial court subsequently found that he posed a continuous threat of violence to C and, pursuant to General Statutes (Supp. 2018) § 46b-15,[5] issued a one year, full

violate public policy." Id., 863. The Appellate Court, however, did not treat the quoted language as the standard by which the public policy claim was to be measured. In *Brantley*, the arbitrator had imposed an eight month, unpaid suspension in lieu of termination after it was determined that the plaintiff, a New Haven firefighter, had violated the city's computer hardware and software policy. Id., 855–56, 858. A careful reading of *Brantley* makes clear that the Appellate Court's statement that it could not conclude that the plaintiff's conduct was so egregious that it required nothing less than termination was simply meant to convey that termination of the plaintiff's employment was not the only means of vindicating the public policy at issue in that case. The "nothing less than termination" language appeared for the first time in a decision of this court in 2013. See *State* v. *AFSCME, Council 4, Local 391*, 309 Conn. 519, 531, 69 A.3d 927 (2013) (quoting *Brantley*). Notably, I have not found a federal or state court case that has ever cast the issue in similar terms, that is, as requiring a determination of whether nothing less than termination of employment will suffice to vindicate the public policy at issue. To be sure, casting the issue in these terms is logical when discipline has been imposed by the arbitrator because, if a six or eight month, unpaid suspension cannot vindicate the public policy at issue, then, logically, nothing short of termination will. The present case, however, presents a highly unique circumstance—one that readily distinguishes it from cases that have come before it—because the arbitrator imposed no discipline at all for conduct palpably at odds with the employee's job duties and the employer's mission.

[4] In accordance with federal law; see 18 U.S.C. § 2265 (d) (3) (2018), as amended by the Violence Against Women Act Reauthorization Act of 2022, Pub. L. No. 117-103, § 106, 136 Stat. 49, 851; we decline to identify any person protected or sought to be protected under a protection order, protective order, or a restraining order that was issued or applied for, or others through whom that person's identity may be ascertained.

[5] General Statutes (Supp. 2018) § 46b-15 (a) provides in relevant part: "Any family or household member . . . who has been subjected to a continuous threat of present physical pain or physical injury, stalking or a pattern of threatening, including, but not limited to, a pattern of threatening . . . by another family or household member may make an application to the Superior Court for relief under this section. . . ."

"Section 46b-15 is part of title 46b [of the General Statutes], 'Family Law,' and chapter 815a, 'Family Matters,' and, as such, is specifically included as a court proceeding in a family relations matter. See General Statutes § 46b-

domestic violence order of protection against him. As a result of these events, which were widely publicized in the media, the grievant was terminated from his position as the director of student conduct at Central Connecticut State University (university). In that capacity, the grievant had been tasked with investigating and prosecuting violations of the student code of conduct, including intimate partner violence, stalking, and dating violence. The grievant was also a member of the university's threat assessment, behavioral risk, and sexual assault response teams, and the self-described "deputy Title IX officer" for the university.[6] Given his behavior on the night in question, his utter lack of remorse afterward, and the highly sensitive nature of his work, the university determined that the grievant could no longer discharge the duties of his office.

For the reasons set forth hereinafter, and after due consideration of the four factors articulated by this court in *Burr Road*,[7] I conclude that, when an employee tasked with investigating and prosecuting violations of the student code of conduct is himself accused of criminal misconduct, and his response is to refuse to open his door to the police for almost three hours, to refuse to unload his firearms, and to repeatedly warn the police not to breach his house, it is against the explicit, well-

1 (5)." *Princess Q. H.* v. *Robert H.*, 150 Conn. App. 105, 111 n.3, 89 A.3d 896 (2014). "The plain language of § 46b-15 clearly requires a continuous threat of present physical pain or physical injury before a court can [issue] a domestic violence restraining order." *Krystyna W.* v. *Janusz W.*, 127 Conn. App. 586, 590, 14 A.3d 483 (2011).

[6] Title IX was enacted as part of the Education Amendments of 1972, Pub. L. No. 92-318, §§ 901–907, 86 Stat. 235, 373–75 (codified as amended at 20 U.S.C. §§ 1681 through 1688 (2018)).

Title IX provides in relevant part: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681 (a) (2018).

[7] See *Burr Road Operating Co. II, LLC* v. *New England Health Care Employees Union, District 1199*, supra, 316 Conn. 634.

defined, and dominant public policies against armed resistance to arrest, of preserving the peace, and of noninterference with the police to unconditionally reinstate him to his former position. Under General Statutes (Rev. to 2017) § 46b-38b,[8] which was enacted in response to a well-known domestic violence tragedy, the police were required to arrest the grievant and were authorized to seize any weapons in his possession. The facts known to the police at the time fully supported such action. The message that the arbitrator's no consequences award sends to other employees occupying similar positions of trust, not to mention the nonparty stakeholders in this case—students, their parents, and the public at large—is simply untenable. I therefore would affirm the trial court's judgment vacating the award as against public policy.

## I

### FACTS AND PROCEDURAL HISTORY

The following facts, which were either found by the arbitrator or are undisputed, support the conclusion that reinstating the grievant to his former position, without any disciplinary action, violates several explicit, well-defined, and dominant public policies.[9]

---

[8] General Statutes (Rev. to 2017) § 46b-38b provides in relevant part: "(a) Whenever a peace officer determines upon speedy information that a family violence crime has been committed within such officer's jurisdiction, *such officer shall arrest the person . . . suspected of its commission and charge such person . . . with the appropriate crime. . . .* Whenever a peace officer determines that a family violence crime has been committed, such officer may seize any firearm or electronic defense weapon, as defined in section 53a-3, or ammunition at the location where the crime is alleged to have been committed that is in the possession of any person arrested for the commission of such crime or suspected of its commission or that is in plain view. . . ." (Emphasis added.)

[9] In addition to the policies identified by the majority, the plaintiff, the state of Connecticut (state), cites to numerous statutes that evince a policy of preventing intimate partner violence and of regulating conduct among faculty and staff on university campuses. See, e.g., General Statutes § 10a-55m (policies relating to sexual assault, stalking, and intimate partner violence in state higher education system); General Statutes § 10a-55n (policies

On the night in question, C left the couple's home in the middle of the night wearing only a bathrobe. Once outside, she dialed 911 and reported that the grievant was suicidal and that he had threatened to kill himself and her. C informed the police that the grievant had held her for hours in the basement of their home accusing her of having an affair and that "she was petrified and concerned about the safety of her children, who were still in the home." C refused to come out of hiding until she was assured that the police were on the scene. The first officer to arrive described her as "frantic" and observed red marks around her neck and scratches on her face.

As the officer approached the house, the grievant opened a second floor window. A next-door neighbor and friend of the grievant heard the officer say to him, " 'what's going on buddy?' " The grievant responded, " 'just come get the kids. I'm not coming out, and I'm

governing establishment and responsibilities of campus resource team, including Title IX coordinator in state institutions of higher education). The state also relies on the Ethical Principles and Practices in Student Conduct Administration, which requires, inter alia, that college and university administrators overseeing student conduct "avoid private interests, obligations, and transactions which are, or appear to be, in conflict of interest with the mission, goals, [or] policies . . . of their employing institution" and "demonstrate concern for the legal, social codes, and moral expectations of the communities in which they live and work . . . ." Association for Student Conduct Administration, Ethical Principles and Practices in Student Conduct Administration, pp. 3, 4, available at https://www.theasca.org/assets/pdf/ASCA+Principles+and+Practices+-+Feb+2017/ (last visited May 29, 2024) Finally, the state relies on the Connecticut State Colleges and Universities System Code of Conduct for Regents, Employees and Volunteers, which provides in relevant part that "[a]ll members of the [Connecticut State Colleges and Universities] community have a duty to conduct themselves with integrity, to act with the highest ethical and professional standards, to exercise responsible judgment, and to demonstrate accountability and compliance with state and federal law . . . ." The Connecticut State Colleges and Universities System Code of Conduct for Regents, Employees and Volunteers (October 19, 2017) p. 1, available at https://www.ct.edu/files/pdfs/4.10%20Code%20of%20Conduct%20for%20RegentsEmployeesVolunters.pdf (last visited May 29, 2024).

not staying in the window.' " The grievant then called the Hartford Police Department and told the dispatcher that the police should remove his children from the home. The dispatcher asked the grievant whether there were any firearms in the home, and he responded that there were several. When asked if he would unload them, the grievant refused to do so. According to the arbitrator, the grievant also "refused to open the door as requested by the officers on the scene and informed the dispatcher that he . . . was unwilling to stay near the window and 'be taken out.' . . . He told [the dispatcher] that he was willing to talk to an officer . . . if they would call his cell phone but was unwilling to 'surrender yet.' He repeatedly told [the dispatcher], 'do not breach this house'. . . ." The grievant informed the dispatcher that "he had a gun on his person" and stated, " 'do not come into this house yet, please sir, right now, I am in a bad place . . . [and] I need to talk to somebody.' " He also warned that "many people will be hurt by his actions." The chief of the Hartford Police Department, several supervisors, and an emergency response team all responded to the scene.

The arbitrator found that, during the standoff, the grievant called his best friend and told him that C "had admitted to him that evening that she was having an affair." "In addition to [making ten] calls to the police, the grievant called a number of other individuals, including his mother (several times), his sister-in-law . . . and his best friend . . . ." In one of the calls to his mother, he informed her "that [C] gets a phone call each evening from another female around 12 a.m." He also called Greg Sneed, the chief of the university's police department.

After the grievant refused to unload his weapons, the police placed barriers around his home and cordoned off the street. Nearby residents were "advised . . . to evacuate to an established safe zone, where a passenger

bus was on standby." At some point, the Hartford police chief called Richard Bachoo, the university's chief administrative officer, to advise him of what was happening at the grievant's home. Bachoo drove immediately to the scene. When he arrived, the grievant's mother was standing outside the house, and they had a conversation. Several hours after the incident began, and after numerous conversations with the officer tasked with negotiating the conditions of the grievant's surrender, the grievant agreed to exit his residence. He was then taken by ambulance to a hospital for observation and, thereafter, arrested.

Immediately following this incident, C sought and obtained a temporary restraining order against the grievant. A contested hearing followed two weeks later at which C was extensively cross-examined by the grievant's attorney. This hearing resulted in the issuance of a full protective order, which the grievant did not appeal.[10] The family services report that was issued in

[10] A transcript of the protective order hearing was entered in evidence at the arbitration hearing. The trial court that issued the order heard the following testimony from C. On the night in question, after C had put her and the grievant's children to bed, the grievant lured her to the basement door by falsely claiming there was an infestation of ants in the pantry, which was located next to the basement door. When C went to investigate, the grievant "grabbed [her] by [the] throat and . . . the back of [her] hair, and got in [her] face and said, you fucked up in therapy today, bitch. And you know you fucked up. Why do you try to embarrass me? Why? Why are you doing this? If you think I'm a monster, I'm going to show you what a monster I really am. At that point, [the grievant] pulled [C] down the basement steps [and] brought [her] over to [the] laundry utility area. He had [her] by the throat . . . . [C] told him that [she] couldn't breathe, and he responded, good. . . . [She] put [her] thumb in to try . . . [to] get some air . . . [and] started to become a little sick. He . . . let go of [her] throat . . . at [which] point [she] bent over to vomit on the floor. [C] was gagging [at this point], and, while [she] was bent over, [the grievant] said to [her], sounds like you need a little help with that . . . ." It was then that C saw "strips of . . . preripped duct tape hanging from the beams . . . from the ceiling" and "thought that . . . he was going to kill [her]." (Internal quotation marks omitted.) The grievant began asking C many questions. "[They] had . . . been to marriage counseling that morning, where [C] had stated that [she] was going to be filing for a divorce. [They] had been going back and forth

connection with that judicial proceeding concluded that there was a high risk of recidivism. Following his arrest, the grievant was charged with kidnapping in the first degree, strangulation in the first degree, threatening in the second degree, assault in the third degree, breach of peace in the second degree, and two counts of risk of injury to a child. The charges were dismissed after C declined to cooperate in the criminal prosecution against the grievant. At the arbitration hearing, C testified that she " 'didn't want to bring [her] children to see their father in jail.' "

---

with that, with divorce proceedings, and trying to agree to an amicable way to have a divorce. [The grievant] was not agreeable [to] any of it." (Internal quotation marks omitted.) He told C that "he was going to . . . get the truth out of [her] . . . no matter what. So, he began asking . . . [her] whether [she] was a terrible mother . . . if [she] was having an extramarital affair . . . [and] if [she] . . . had abandoned him. At this point, [the grievant] had his hand around [her] throat again, and he was squeezing. . . . [C] said, you're right. I'm all those horrible things. You're . . . absolutely right. . . . Please let me go. I can't breathe." (Internal quotation marks omitted.) After a while, the grievant called his mother and told her "that it was over, [that] he had gone too far, and that there was no coming back from this. [The grievant's mother] was on speaker phone. She . . . asked [the grievant] to please [leave] the basement and [to] go back upstairs, [and] to let [C] go. . . . [A]fter a while, she . . . convince[d] him to let [C] go and to go upstairs. Once [they] were upstairs . . . [the grievant's mother] asked [C] if she was safe, and [C] said, no." (Internal quotation marks omitted.) When the grievant sat down at the kitchen table, C grabbed her cell phone and ran from the house. After the grievant's attorney finished cross-examining C, the trial court stated: "All right, this is no surprise to anyone. I'm going to enter a full protective order for one year."

The arbitrator found that C's claim that the grievant had been violent toward her during their confrontation was not credible and, on the basis of this finding, reinstated the grievant with full back pay and benefits. The arbitrator based his finding of nonviolence on the following three facts: (1) there was "no mention" in the police report that the investigating officer had observed vomit on the basement floor, (2) the grievant's blood alcohol level was zero when it was tested the morning after the confrontation, and (3) DNA testing of the strips of duct tape that the grievant allegedly had used to bind C's wrists during the assault revealed only C's DNA on one of the strips. The arbitrator therefore credited the grievant's argument that, "if [C's] allegation were true, then his DNA would be on both pieces of the tape. . . . However, since his DNA was found on only one piece of tape, this evidence proves that [C] was lying."

After the events in question, four students whom the grievant previously had investigated and prosecuted asked to have their cases reopened by the university, and the parents of another student requested that the grievant have no further contact with their daughter. Prior to terminating the grievant's employment, the university conducted a *Loudermill* hearing[11] at which the grievant " 'spent a lot of time' discrediting [C]." The grievant confirmed this at the arbitration hearing, testifying that "he provided analysis (as a trained investigator) of [C's] 911 call to the police, and her testimony at the hearing for a protective order." The grievant's termination letter stated in relevant part: "[D]uring the *Loudermill* [hearing], you attempted to refute the [u]niversity's evidence by claiming that the entire incident was fabricated by [C] in an attempt to have you 'out of the picture' in both your married life and your children's lives. This was allegedly done so that she could continue a relationship with the person you claim she was having an adulterous affair with . . . . Although you played recordings of interviews, cited dates and times of various phone calls, and showed images of texts and pictures taken by you, you did not produce any evidence mitigating your actions on the night of the incident.

"In your position as [d]irector of [s]tudent [c]onduct, you must adjudicate matters and determine disciplinary consequences in matters involving students who have been alleged to have engaged in serious misconduct, including conduct of a criminal nature. Your behavior

---

[11] "[A] tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story before termination. . . . The opportunity to present one's side of the story is generally referred to as a *Loudermill* hearing." (Citation omitted; internal quotation marks omitted.) *AFSCME, Council 4, Local 2663* v. *Dept. of Children & Families*, 317 Conn. 238, 243 n.3, 117 A.3d 470 (2015); see also *Cleveland Board of Education* v. *Loudermill*, 470 U.S. 532, 546, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985).

on April 24–25, 2018, undermines your ability to carry out the duties and functions of your position."

At the arbitration hearing, the grievant "admitted [to] having a confrontation with [C] in the basement [of his home] but claimed [that] it was nonviolent. . . . He claimed [that] he was never told why the police were at his home that evening. . . . He alleged that he was being 'set up' and expounded at length about the recent police killings of black men. . . . He testified that his reluctance to leave his home was because he was trying to preserve his life." The grievant further claimed that, when he told the police during the standoff "that many people will be hurt by his actions," what he meant was that "many people would be hurt as a result of the breakdown of [his] marriage and [C's] infidelity." Much of the grievant's testimony "delved into the problems of his marriage . . . [in] an attempt to show [C's] lack of truthfulness." The arbitrator found that, "[although the grievant's] testimony was marked at times by out-rage and an inclination to infer bad motives for those who were responsible for his prosecution and discharge, the grievant was generally consistent and clearly able to recollect and communicate in great detail about the events that occurred that evening."

The arbitrator concluded that whether the university had just cause to terminate the grievant's employment turned "on the credibility of the two main participants . . . the grievant and [C]. Each has an entirely different version of the events of that evening." The arbitrator was ultimately persuaded by the grievant's claim that the confrontation between him and C was nonviolent, and, on the basis of that finding, the arbitrator concluded that the grievant was not to blame for his stand-off with the police.[12] The arbitrator reasoned that the

[12] In his decision, the arbitrator dismissed the university's many concerns regarding the standoff and its impact on the university, stating: "This brings me to the university's claim that the dismissal of the criminal charges does not alter the facts that are not disputed, and which still warrant his discharge,

standoff was actually C's fault because, had she not called 911 and falsely accused the grievant of assaulting her, the grievant would not have been put in the position to have to defend himself from the police.[13]

The trial court granted the application of the plaintiff, the state of Connecticut (state), to vacate the arbitration award, observing that it was undisputed that, on the night in question, the grievant had "informed the police that he had loaded firearms in the house, including one on his person, and expressly declined the police request to unload the weapons. He also refused to open the door as requested by the officers on the scene. The standoff continued for hours. All this occurred while his children were in the house." On the basis of these facts, the court concluded that the case implicated "explicit, well-defined, and dominant public policies concerning the protection of children, preserving the peace, preventing interference with police personnel in the performance of their duties, and endangering police officers . . . ." The court then applied the four factors

i.e., guns in the house, a refusal to leave the home for a substantial amount of time, his statement during conversations with the police that many people will be hurt, the protective order by the family court, the negative publicity and the resulting requests by students to have their files reviewed, and the fact that children were present in the home. But this argument ignores the fact that the grievant claimed that [C] had made fake allegations. If this claim is true, and [C's] charges were false, then the SWAT team's presence, the resulting 'standoff,' and the negative publicity [were] not precipitated by any conduct by the grievant."

[13] The arbitrator's reasoning that an armed resistance to arrest is excusable is itself contrary to public policy. See, e.g., *State* v. *AFSCME, Council 4, Local 387*, 252 Conn. 467, 477, 747 A.2d 480 (2000) ("the award—with its inherent rationalization of conduct . . . violative of statute and regulations—is in itself violative of clear public policy"); see also *Welch Foods, Inc.* v. *General Teamsters Local Union No. 397*, Docket No. 1:19-cv-00322, 2020 WL 7130670, *5 (W.D. Pa. August 6, 2020) (report and recommendation of United States magistrate judge) ("the proposition that [the] [g]rievant should be reinstated because the female employee 'instigated' the argument sounds disturbingly like excusing the inexcusable because 'she started it' "), adopted, Docket No. 19-322, 2020 WL 5834210 (W.D. Pa. September 30, 2020).

set forth in *Burr Road* for determining whether an arbitration award violates public policy and concluded that each factor weighed in favor of vacating the award in this case.

## II

## LEGAL PRINCIPLES

Although this court undertakes judicial review of arbitral awards in a manner designed to minimize interference with an arbitration award, "[w]e . . . submit to higher scrutiny an . . . award that is claimed to be in contravention of public policy. . . . [P]arties cannot expect an arbitration award approving conduct [that] is . . . contrary to public policy to receive judicial endorsement any more than parties can expect a court to enforce such a contract between them." (Internal quotation marks omitted.) *Burr Road Operating Co. II, LLC* v. *New England Health Care Employees Union, District 1199*, supra, 316 Conn. 629–30. "Thus, when a party challenges a consensual arbitral award on the ground that it violates public policy, and [when] that challenge has a legitimate, colorable basis, de novo review of the award is appropriate in order to determine whether the award does in fact violate public policy." (Internal quotation marks omitted.) Id., 630; see also *W. R. Grace & Co.* v. *Local Union 759, International Union of the United Rubber, Cork, Linoleum & Plastic Workers of America*, 461 U.S. 757, 766, 103 S. Ct. 2177, 76 L. Ed. 2d 298 (1983) ("the question of public policy is ultimately one for resolution by the courts"); *Iowa Electric Light & Power Co.* v. *Local Union 204 of the International Brotherhood of Electrical Workers (AFL-CIO)*, 834 F.2d 1424, 1427 (8th Cir. 1987) ("[b]ecause collective bargaining agreements do not formulate public policy, and arbitrators cannot consider matters not encompassed by the governing agreements, the ques-

tion of public policy is ultimately one for resolution by the courts" (internal quotation marks omitted)).

In *Burr Road*, this court held that, when determining whether termination of employment is required to vindicate the public policy at issue, a court should focus on four principal factors (*Burr Road* factors): "(1) any guidance offered by the relevant statutes, regulations, and other embodiments of the public policy at issue; (2) whether the employment at issue implicates public safety or the public trust; (3) the relative egregiousness of the grievant's conduct; and (4) whether the grievant is incorrigible."[14] *Burr Road Operating Co. II, LLC* v. *New England Health Care Employees Union, District 1199*, supra, 316 Conn. 634. We also "clarif[ied] the extent to which the factual findings of the arbitrator control or affect the reviewing court's analysis under each factor"; id., 634; and concluded that they have no effect on the first two factors; id., 635, 637; and minimal effect on the third factor. Id., 638. That is, in determining the relative egregiousness of the grievant's conduct, "[w]e take as our starting point the factual findings of the arbitrator, which are not subject to judicial review." Id. Our determination of whether the conduct in question was egregious, however, "is not restricted to those findings. . . . A broader review is required because the arbitrator, in determining whether there was just cause or some other contractual basis for termination, may focus on [case-specific] considerations such as how the employer has disciplined other employees under similar circumstances. Judicial review, by contrast, necessarily transcends the interests of the parties to the contract, and extends to the protection of other stakeholders and the public at large, who may be adversely impacted by the decision to reinstate the employee. . . . Accordingly, we review de novo the question whether the rem-

---

[14] The *Burr Road* factors contain a myriad of subfactors, which I address in connection with my analysis of the four principal factors.

edy fashioned by the arbitrator is sufficient to vindicate the public policies at issue." (Citations omitted.) Id., 638–39. As for the fourth factor (incorrigibility), "[b]ecause [the] considerations [that affect our analysis of this issue] are largely fact based and [case-specific], a reviewing court must defer to an arbitrator's assessment—whether express or implied—that a particular employee is unlikely to reoffend if reinstated. . . . [In the absence of] an express finding by the arbitrator, which would be unreviewable, a court will deem an employee incorrigible only when the likelihood of recidivism is plain from the face of the record." (Citations omitted.) Id., 640.

## III

## ANALYSIS

### A

### Statutes, Regulations, and Other Embodiments of Public Policy

"The first [*Burr Road*] factor requires us to consider whether the relevant statutes, regulations, and other manifestations of the public policy at issue themselves recommend or require termination of employment as the sole acceptable remedy for a violation thereof. . . . Put differently, we ask whether the offense committed by the employee involves the sort of conduct the law deems to be inexpiable, or that would expose the employer to substantial liability if it were to reoccur. . . . Whether sources of public policy themselves mandate termination is a question of law subject to plenary review." (Citations omitted.) Id., 634–35. I agree with the trial court that the first *Burr Road* factor weighs in favor of vacating the award, as the grievant's behavior on the night in question involved the sort of conduct the law deems to be inexpiable or that would expose

the employer to substantial liability if it were to reoccur while he was at work.

To my knowledge, neither this court nor the Appellate Court has ever had a case in which the statute embodying the public policy at issue mandated termination of employment for persons who violated the statute. Such matters are beyond the purview of most statutes, regardless of their subject matter. Notwithstanding, as the majority recognizes, this has not prevented this court and the Appellate Court from concluding that an award violated public policy.[15] See, e.g., *Groton* v. *United Steelworkers of America*, supra, 254 Conn. 46–47; *State* v. *AFSCME, Council 4, Local 387, AFL-CIO*, 252 Conn. 467, 469, 476–78, 747 A.2d 480 (2000); *State* v. *AFSCME, Council 4, Local 2663, AFL-CIO*, 59 Conn. App. 793, 804–806, 758 A.2d 387, cert. denied, 255 Conn. 905, 762 A.2d 910 (2000); *South Windsor* v. *South Windsor Police Union, Local 1480, Council 15, AFSCME, AFL-CIO*, 41 Conn. App. 649, 654, 677 A.2d 464, cert. denied, 239 Conn. 926, 683 A.2d 22 (1996).

B

Public Safety and Public Trust

The second *Burr Road* factor also weighs in favor of vacating the award, as the grievant's position at the university clearly implicates public safety and the public trust. The majority does not contend otherwise. Instead, the majority minimizes the import and impact of this factor by arguing that "multiple employees of the university who occupied positions of public trust [have] been arrested for off-duty conduct," including the uni-

[15] This court noted in *Burr Road* that, although the public policy ground for vacatur is a narrow one and appeals involving such challenges are brought to us infrequently, in one half of them, we held that reinstatement of the employee violated a clear public policy. See *Burr Road Operating Co. II, LLC* v. *New England Health Care Employees Union, District 1199*, supra, 316 Conn. 632.

versity's president "for impersonating a police officer," and, yet, none of them has had his or her employment terminated. This court has no knowledge of the circumstances of those cases, including whether any discipline was imposed in lieu of termination. Even if we did, our case law establishes that, although this type of information may be relevant to an *arbitrator* in determining just cause and an appropriate penalty, it is not relevant to this court's public policy analysis. As we stated in *Burr Road*, de novo review is applied in cases such as the present one precisely "because the arbitrator, in determining whether there was just cause or some other contractual basis for termination, may focus on [case-specific] considerations such as how the employer has disciplined other employees under similar circumstances. Judicial review, by contrast, necessarily transcends the interests of the parties to the contract, and extends to the protection of other stakeholders and the public at large, who may be adversely impacted by the decision to reinstate the employee." *Burr Road Operating Co. II, LLC* v. *New England Health Care Employees Union, District 1199*, supra, 316 Conn. 639; see also C. Fox & B. Gruhn, "Toward a Principled Public Policy Standard: Judicial Review of Arbitrators' Decisions," 1989 Det. C. L. Rev. 863, 871–72 (1989) ("The arbitrator has no superior knowledge of public policy. Far from being an expert on public policy, an arbitrator [is precluded from] even consider[ing] public policy issues. . . . By definition, arbitral awards that impact public policies affect persons not party to the contract. The public has not contracted for an arbitrator's powers; it should not be held hostage to [his] whims. [Because] the arbitrator may not protect these extra-contractual interests, it would be inequitable to prevent the courts from doing so." (Footnotes omitted.)). These stakeholders "were not party to the collective bargaining agreement, nor were they party to the arbitra-

tion clause. When public policies protecting the general public are threatened by an arbitrator's decision, the [general rule] 'they bargained for it, they'll have to live with it' rationale is inapplicable." C. Fox & B. Gruhn, supra, 890.

## C

### Egregiousness

In assessing the third *Burr Road* factor, the relative egregiousness of the grievant's offense, *Burr Road* directs us to consider a multitude of subfactors, including "(1) the severity of the harms imposed and risks created by the grievant's conduct; (2) whether that conduct strikes at the core or falls on the periphery of the relevant public policy; (3) the intent of the grievant with respect to the offending conduct and the public policy at issue; (4) whether reinstating the grievant would send an unacceptable message to the public or to other employees regarding the conduct in question; (5) the potential impact of the grievant's conduct on customers/clients and other nonparties to the employment contract; (6) whether the misconduct occurred during the performance of official duties; and (7) whether the award reinstating the employee is founded on the arbitrator's determination that mitigating circumstances, or other policy considerations, counterbalance the public policy at issue." *Burr Road Operating Co. II, LLC* v. *New England Health Care Employees Union, District 1199*, supra, 316 Conn. 638. In the present case, all but two of these subfactors weigh in favor of vacating the award.

As the trial court stated, the grievant's conduct "[struck] at the core, not the periphery of the public policies" at issue and had "a direct connection to the responsibilities of [his position]." This can hardly be disputed. Indeed, the nexus between the grievant's conduct, his job duties, and the public policies at issue could not

be any starker.[16] The severity of the risks created by the grievant's armed standoff with the police, which required the police to evacuate the grievant's street in the middle of the night, are equally self-evident, as is the message that his unconditional reinstatement sends to the community. As the trial court stated, the message it sends is "that it is appropriate for a university administrator charged with the public trust of investigating and enforcing the code of student conduct to take the law into his own hands . . . to refuse to unload weapons, and [to] maintain a lengthy standoff with [the] police. The recipients of such a message would include students, parents, other staff, and the public."[17]

[16] This case bears no resemblance to cases in which the employee held no position of trust and/or the misconduct was unrelated to the duties of the employee's job. See *State* v. *Connecticut Employees Union Independent*, supra, 322 Conn. 734–35 (when hospital maintenance worker's employment was terminated after he was caught smoking marijuana in hospital parking lot, "[t]he arbitrator [correctly] concluded that termination of the grievant's employment was unwarranted, but nevertheless imposed a severe punishment on the grievant, relying, in part, on mitigating circumstances, such as his positive work record, and competing policy aims, such as progressive discipline and the promotion of rehabilitation").

[17] The majority asserts that, "[i]nstead of relying on the factual findings of the arbitrator, as we must, the dissent makes numerous factual inferences and relies on speculation to reach its conclusion. For instance, the dissent asserts that '[t]he message that the . . . [arbitration] award sends to other employees occupying similar positions of trust, not to mention the nonparty stakeholders in this case—students, their parents, and the public at large—is simply untenable.' " The majority further asserts that "[t]he dissent's entire position rests on its disagreement with the remedy chosen by the arbitrator." The majority's criticism in this regard is unfounded.

A reviewing court does not engage in impermissible fact-finding or speculation when it considers "whether reinstating the grievant would send an unacceptable message to the public" and/or "the potential impact of the grievant's conduct on customers/clients and other nonparties to the employment contract . . . ." *Burr Road Operating Co. II, LLC* v. *New England Health Care Employees Union, District 1199*, supra, 316 Conn 638. The court is simply doing its job under *Burr Road*, which expressly requires it to consider these and other factors de novo. See, e.g., *Bridgeport Board of Education* v. *NAGE, Local RI-200*, 160 Conn. App. 482, 502, 125 A.3d 658 (2015) (termination of employee's employment was warranted because "[a] lesser sanction would send an unacceptable message to the public and other employees that a threat by an employee to commit random shootings in an educational setting is permissible or excusable"). Indeed, the case law and

As for "the intent of the grievant with respect to the offending conduct and the public policy at issue"; *Burr Road Operating Co. II, LLC* v. *New England Health Care Employees Union, District 1199*, supra, 316 Conn. 638; the record makes clear that the grievant intended his actions. I note in this regard the arbitrator's finding that "[t]here was one aspect of [the grievant's] testimony that was substantially contradicted by other evidence. [His friend Robert] DelPomo testified that he had a conversation with the grievant sometime after 1 a.m. In that conversation, the grievant told DelPomo that he didn't know why the police were at his home. However, the grievant admitted that he had called the police at 12:12 a.m. The recording of that conversation reveals that the grievant clearly knew why the police were at his home." The arbitrator further found that the grievant refused to open his door, refused to unload his weapons, and repeatedly warned the police "not [to] breach this house . . . ."[18] (Internal quotation

treatises make clear that the arbitrator is not permitted to consider these questions when deciding whether there was just cause for termination, and, therefore, there is no reason for there to be arbitral findings with respect thereto. See 20 R. Lord, Williston on Contracts (4th Ed. 2024) § 56:111 ("[b]ecause collective bargaining agreements do not formulate public policy, and arbitrators cannot consider matters not encompassed by governing agreements, the question of whether an arbitration award violates public policy is ultimately one for resolution by the courts" (footnote omitted)); Fox & B. Gruhn, supra, 1989 Det. C. L. Rev. 871–72 ("Far from being an expert on public policy, an arbitrator [is precluded from] even consider[ing] public policy issues. . . . By definition, arbitral awards that impact public policies affect persons not party to the contract." (Footnote omitted.)). *Burr Road* itself expressly "clarif[ied] the extent to which the factual findings of the arbitrator control or affect the reviewing court's analysis under each [*Burr Road*] factor"; *Burr Road Operating Co. II, LLC* v. *New England Health Care Employees Union, District 1199*, supra, 316 Conn. 634; and concluded that our determination of whether the conduct in question was egregious "*is not restricted to* [*the arbitrator's*] *findings.*" (Emphasis added.) Id., 638. The majority does not cite a single case, and my research has found none, to suggest that these questions of public policy, which are expressly reserved for the court, are to be answered by the arbitrator in the first instance.

[18] The police ultimately recovered "eleven firearms, several firearm magazines, one BB gun, [and] copious amounts of ammunition in various calibers

marks omitted.) Given these findings, as well as the grievant's statement that he was not ready to surrender, there can be no question but that the grievant intended to interfere with the police and to resist arrest. See General Statutes § 53a-167a (a) ("[a] person is guilty of interfering with an officer when such person obstructs, resists . . . [or] hinders . . . any peace officer . . . in the performance of such peace officer's . . . duties").

The next subfactor we consider in evaluating whether misconduct was egregious is whether it occurred during the performance of the employee's official duties. As the majority notes, most of the cases that have come before this court or the Appellate Court have involved on-the-job misconduct. Although this is an important factor, it is not a dispositive one. See, e.g., *State* v. *AFSCME, Council 4, Local 2663, AFL-CIO*, supra, 59 Conn. App. 802–803 ("we cannot accept . . . that the commission of illegal activity inside or outside of work is a dispositive factor for determining the presence or absence of a public policy [violation]"). As the arbitrator noted in his decision, "[t]here is no shortage of arbitration decisions upholding termination premised on off-duty criminal conduct. The pivotal factor in off-duty misconduct cases is the nexus between the employee conduct and the employer's legitimate interests in an effective business operation." (Internal quotation marks omitted.)

This is so because "[i]mproper conduct in an employee's personal life can have various effects on the employee's workplace. [Thus, we must] consider in cases such as these the nature of the improper act, its severity and the kind of the work the employee performs." *State* v. *AFSCME, Council 4, Local 2663, AFL-CIO*, supra, 59 Conn. App. 803; see also *AFSCME*,

. . . ." Nine of the firearms were registered to the grievant. Two of them were unregistered.

*Council 4, Local 2663* v. *Dept. of Children & Families*,
317 Conn. 238, 255–56, 117 A.3d 470 (2015) ("To the
extent that the union contends that the arbitrator
exceeded her authority in relying on [the employee's]
off duty conduct, we disagree. . . . The collective bar-
gaining agreement did not . . . limit just cause for dis-
missal to conduct on the job. . . . Nor did it specify
that any off duty misconduct must impair the employ-
ee's ability to perform her particular job responsibili-
ties, as opposed to [impairing] the [employer's] ability
to perform its mission generally." (Citation omitted;
footnote omitted.)).

I can perceive of no reason why off-duty misconduct
that strikes at the core of the employee's job duties, as
it did here, should not support a finding of egre-
giousness. In *South Windsor* v. *South Windsor Police
Union, Local 1480, Council 15, AFSCME, AFL-CIO*,
supra, 41 Conn. App. 649, the Appellate Court held that
an arbitration award reinstating a police officer who
intentionally revealed the identity of a confidential
informant violated public policy. Id., 654. I have no
doubt that the result would have been the same if the
officer had disclosed the informant's identity outside
of work. There will be cases in which the nexus between
misconduct and the employee's job is so manifest that
it simply cannot matter when or where it occurs. In my
view, this is such a case.

Lastly, we must consider whether the award reinstat-
ing the grievant with no discipline whatsoever is founded
on the arbitrator's determination that mitigating circum-
stances, or other policy considerations, counterbal-
anced the public policy at issue. As the majority notes,
"[t]he arbitrator credited the grievant's testimony about
the recent killings of Black men [by the police] and his
resultant fear for his safety" and that "he felt [that] his
life was in danger and [he] was unwilling to exit until
he felt confident about his safety." (Internal quotation

marks omitted.) Contrary to the majority, I cannot conclude that the grievant's reasonable fear is sufficient to overcome the conclusion that his reinstatement, without any sanction, violates public policy. See *Philadelphia Housing Authority* v. *AFSCME, District Council 33, Local 934*, supra, 617 Pa. 83 ("a holding that the arbitrator's award [imposing no sanction] did not violate a well-defined, explicit and dominant public policy would construe the public policy exception so narrowly that it would be, as a practical matter, completely negated"); id., 82–83 ("[t]he absurd award here [imposing no sanction] makes a mockery of the dominant public policy . . . by rendering public employers powerless to take appropriate actions to vindicate a strong public policy").

In reaching this conclusion, I am mindful that this court is not bound by an arbitrator's findings of mitigation. See, e.g., *Burr Road Operating Co. II, LLC* v. *New England Health Care Employees Union, District 1199*, supra, 316 Conn. 638–39; see also *State* v. *AFSCME, Council 4, Local 387, AFL-CIO*, supra, 252 Conn. 479 (*Peters, J.*, concurring) ("this court is not bound by arbitral finding of mitigating circumstances in light of the egregious nature of the employee's conduct"). We also have repeatedly eschewed the idea "that stress, or poor judgment, or other factors, somehow [render egregious behavior] permissible or excusable." (Internal quotation marks omitted.) *State* v. *AFSCME, Council 4, Local 387, AFL-CIO*, supra, 252 Conn. 477; see id., 469, 471, 477–78 (vacating award reinstating corrections officer who committed harassment in second degree notwithstanding arbitrator's mitigation findings and imposition of sixty day unpaid suspension); see also *Bridgeport Board of Education* v. *NAGE, Local RI-200*, 160 Conn. App. 482, 486–88, 502, 505, 125 A.3d 658 (2015) (vacating award reinstating school custodian who threatened violence in letter to his superiors not-

withstanding arbitrator's finding that letter was " 'cry for help' " and imposition of unpaid suspension).

In reaching a contrary conclusion, the majority conflates two distinct concerns. There can be no serious dispute as to the disparate treatment that people of color, especially Black men, have received at the hands of the police, resulting in what this court has described as a justified fear "that contact with the police can itself be dangerous, apart from any criminal activity associated with the officer's sudden presence." (Internal quotation marks omitted.) *State* v. *Edmonds*, 323 Conn. 34, 74, 145 A.3d 861 (2016). These very real concerns, however, cannot excuse a refusal to cooperate with law enforcement officers, which in turn may result in an escalation of the police response, as it did in the present case. Even more to the point, this court cannot condone an hours long armed resistance to arrest, even if an individual feared for his safety and believed that he was innocent of any crime.

## D

### Incorrigibility

The final *Burr Road* factor, incorrigibility, requires us to consider, inter alia, whether the grievant "has demonstrated a willingness to change and an amenability to discipline," "has exhibited remorse and attempted to make restitution for past offenses," and "is likely to benefit from additional training and guidance." *Burr Road Operating Co. II, LLC* v. *New England Health Care Employees Union, District 1199*, supra, 316 Conn. 639–40. Although the arbitrator made few findings with respect to this issue, one searches the record in vain for any sign that the grievant felt the slightest remorse or responsibility for what had occurred. To the contrary, as the arbitrator noted, and the transcripts, pleadings, exhibits, and memoranda of law reveal, the grievant accepts no responsibility and has shown no remorse.

The grievant's defense at both the *Loudermill* hearing and the arbitration proceedings, which were separated in time by nearly two years, focused on C's "lack of truthfulness," her alleged "adulterous affair," and how he was "set up," not only by C, who he claimed "fabricated" her charges of domestic abuse, but by the university, the police, and the prosecutor as well. On the basis of the record before us, I would conclude that the grievant is incorrigible within the meaning of *Burr Road*.[19]

IV

CONCLUSION

In sum, although there is no requirement that all four *Burr Road* factors weigh in favor of vacating the arbitral award on public policy grounds; see, e.g., *New Haven* v. *AFSCME, Council 4, Local 3144*, supra, 338 Conn. 186–87; they do so in this case. The nexus between the public policies at issue, the grievant's job responsibilities, and the grievant's misconduct is unmistakable and as compelling as in any case in which this court or the Appellate Court has determined that reinstatement violated public policy. Moreover, the present case stands out as being the only one of its kind in which the arbitrator imposed no penalty at all for behavior antithetical to the employee's job duties and the employer's stated mission, goals, and policies. I therefore can-

---

[19] The majority concludes that the grievant is not incorrigible because, following his arrest, he participated in a domestic violence offender program. The program, however, was not a condition of the grievant's reinstatement or otherwise part of the arbitral award. The director of that program, Charles Frazier, who testified on behalf of the grievant at the arbitration hearing, stated that he was unsure whether the grievant's participation in the program was court-ordered or whether it was undertaken on the advice of counsel given the seriousness of the charges the grievant was facing at the time of his arrest. Whatever the reason for the grievant's participation in the program—the arbitrator made no findings with respect to this issue—it does not alter the fact of the grievant's unrepentant stance at the *Loudermill* hearing and during the arbitration proceedings.

not conclude that the award vindicates the important public policies at issue. Accordingly, I would affirm the trial court's judgment vacating the award as against public policy.[20]

---

[20] See General Statutes § 52-418 (b) ("if an award issued pursuant to a grievance taken under a collective bargaining agreement is vacated the court or judge shall direct a rehearing unless either party affirmatively pleads and the court or judge determines that there is no issue in dispute"); *AFSCME, Council 4, Local 1565* v. *Dept. of Correction*, 298 Conn. 824, 852, 6 A.3d 1142 (2010) (when award issued pursuant to grievance taken under collective bargaining agreement is vacated on public policy grounds, "[the court must] remand the case to the arbitrator for further proceedings pursuant to § 52-418 (b)").